IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

GLORIA GUTIERREZ,
    Plaintiff,

v.                              Case No.: 3:14cv271/MCR/EMT

INTEGRATED MEDICAL
TECHNOLOGIES USA, LLC, et al.,
    Defendants.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Cross-Motions for Summary Judgment filed by Plaintiff Gloria Gutierrez (ECF Nos. 103, 121, 122); by Defendant IMT Integral Medizintechnik AG (ECF No. 105) ("IMT-Integral") (in which Defendant Integrated Medical Technologies USA, LLC ("IMT-USA") joined (ECF No. 107)); and by Defendant K&W Associates, LLC ("K&W") (ECF No. 113). Plaintiff and Defendants have both filed responses to the cross-motions, respectively (ECF Nos. 109, 116, 117, 124, 125, 126). This case was initiated by Plaintiff while she had retained counsel. Counsel, however, were granted permission to withdraw, and Plaintiff thereafter elected to proceed as a pro se litigant (ECF Nos. 82, 85, 89).

In light of Plaintiff's pro se status, the case was referred to the undersigned to conduct all preliminary proceedings and issue any recommendations to the district

court regarding dispositive motions. *See* N.D. Fla. Loc. R. 72.2(E); *see also* 28 U.S.C. § 636(b)(1)(B)(C); and Fed. R. Civ. P. 72(b).

After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that Defendants' motions for summary judgment should be granted and Plaintiff's denied.

I.      BACKGROUND

Plaintiff's complaint concerns hip replacement surgery which was performed on her by Dr. Brett Smith, M.D., on January 10, 2013. During the surgery, Dr. Smith used a tool known as a "Woodpecker" device, which Plaintiff claims was defective and caused her injury. She thereby sues Defendant IMT-Integral as the manufacturer of the device, as well as Defendants IMT-USA and K&W as distributors of the device. Plaintiff sues Defendants under a theory of strict liability in tort based on the alleged defect in the Woodpecker device which rendered it unreasonably dangerous. She alleges that as a result of the defect and the resultant fracture the device caused in Plaintiff's femur, Dr. Smith was compelled to use different hardware for the implant, which brought on post-surgical complications resulting in "bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment,

loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future." (ECF No. 21 at 6).

The Woodpecker device used by Dr. Smith during the surgery uses air pressure to "broach" the patient's femur so that the artificial hip can be implanted on the femur (ECF No. 112-1 at 12).[1] Dr. Smith tested the Woodpecker before the surgery to make sure it was working properly, and the device did work properly for the first six broaches into the femur (ECF No. 112-1 at 12–14). On the seventh and final broach, however, the Woodpecker device "kicked," which led Dr. Smith to believe there was something wrong with the device, although at that point he was finished using it (ECF No. 112-1 at 12–13). Dr. Smith noted that the broach was in place, and he did not notice any fracture in the femur or any other problem (ECF No. 106-2 at 16). Dr. Smith then used a hand mallet to put the hip implant in place (ECF No. 106-2 at 16–17). It was at this time that Dr. Smith noticed a "calcar" fracture in Plaintiff's femur no longer than a centimeter in length (ECF No. 106-2 at 17–18, 19–21, 29). Dr. Smith opined that it was "more likely than not" that the Woodpecker device caused the fracture (ECF Nos. 106-2 at 34; 121-2 at 23, 49).

---

[1] All citations to depositions in the record will refer to the page numbers supplied by the court's electronic filing system as opposed to the pagination of the depositions themselves.

Because of the fracture, Dr. Smith used a different type of implant with Ms. Gutierrez, one which uses a different "system" that "bypasses the fracture" (ECF No. 106-2 at 25). Dr. Smith provided that the difference was that he would have to use a two-stem hardware device rather than the one-stem device used during the process involving the Woodpecker (ECF No. 106-2 at 31, 59).[2] Dr. Smith also employed two small cables which were used to wrap around the femur in order to stabilize the fracture (ECF No. 106-2 at 21, 25). Dr. Smith acknowledged that other surgeons regularly use the non-Woodpecker procedure, and he stated that, as far as any patient would notice, there is ordinarily no difference between the two different procedures (ECF No. 106-2 at 26–27).[3]

Dr. Smith related that calcar fractures such as the one that occurred with Plaintiff are a known complication of hip replacement surgery, and common enough that he discusses the possibility of fractures with all his patients before the surgery (ECF No. 106- 2 at 20, 26–28). He noted, however, that there is less risk of a fracture when using the Woodpecker device, and for that reason he prefers to use the Woodpecker (ECF No. 106-2 at 19). Dr. Smith also stated that the Woodpecker was

---

[2] Plaintiff herself referred to this difference, stating that Dr. Smith had to use larger or longer pieces of hardware than he ordinarily would have.

[3] Dr. Smith stated that he has used the "different," non-Woodpecker procedure a multitude of times and has taught others across the country how to use it (ECF No. 106-2 at 25, 29).

more advantageous because it takes less surgical time, requires less bone loss to the femur, and is less expensive (ECF No. 106-2 at 59).

Further, Dr. Smith stated that calcar fractures such as Plaintiff's routinely heal to the point that the patient can be weight-bearing in six to eight weeks. In keeping with that schedule, he examined Plaintiff approximately six weeks after the surgery and found that she had full range of motion (except for adduction motion, which was expected at this stage), that she was maintaining touchdown weight-bearing status, that her pain was controlled, that there was no tenderness in the area and the joint was stable, and that she was doing well overall (ECF No. 106-2 at 23–24). Dr. Smith further provided that, once the fracture heals and physical therapy commences, the long-term prognosis for the patient would be identical with those who did not experience fractures (ECF Nos. 106-2 at 29–31; 121-2 at 65). As for Plaintiff's subsequent injury to her shoulder, Dr. Smith did not agree her use of a walker following the surgery was reasonably expected to have caused shoulder issues because he treats hundreds of patients per year, has "patients on walkers all the time," and stated it would be very infrequent for any of them to develop shoulder pain (ECF No. 106-2 at 44–46). Dr. Smith additionally noted that Plaintiff had already been using a walker for at least six weeks before she had her surgery (ECF No. 106-2 at 62).

Plaintiff was seen by R. Barry Lurate, M.D., for a second opinion with regard to her hip issue (ECF No. 106-3 at 4–5). His assessments included chronic right hip pain that was possibly related to the complications with her hip surgery; however, he stated that Plaintiff's pain was most likely related to degenerative disc disorder in her lumbar spine (ECF No. 106-3 at 9, 18). Dr. Lurate found no evidence that the implant in Plaintiff's hip was loose, and x-rays taken showed no complications in the hip area and otherwise that Plaintiff should be experiencing improvement in the area (ECF No. 106-3 at 7–9, 13). He also opined that, due to the nature of the surgery, a fracturing of the femur such as what Plaintiff experienced is always a possibility regardless of which particular surgical procedure is used (ECF No. 106-3 at 21–22). Dr. Lurate also acknowledged that discrepancies in leg length can result from hip surgeries but that this issue can arise regardless of the procedure employed or whether there were evident complications during the surgery (ECF No. 106-3 at 22). He also stated that issues with uneven leg lengths following the surgery can generally be remedied with shoe lifts (ECF No. 106-3 at 24–25).

Plaintiff was also seen by Donald Dewey, M.D., for a second opinion (ECF No. 106-4 at 8–9). Dr. Dewey performed testing to determine whether there was any loosening of the implant or any abnormality in the femur which might suggest

additional fracturing, injury, or infection, and the results were normal (ECF No. 106-4 at 16). Thus, Dr. Dewey found her to have a stable hip replacement but possibly a mild leg-length discrepancy. He stated that there was a possibility that her pre-op and post-op leg lengths were a little different, for which a heel lift might be needed, but over time she might improve to the point that the heel lift would no longer be needed (ECF No. 106-4 at 17).

Dr. Dewey also confirmed that a calcar fracture can occur in the femur during hip replacement surgery regardless of which procedure is employed (ECF No. 106-4 at 10–11). He also noted that Plaintiff's medical history included avascular necrosis, which might have made her more susceptible to fracturing during the procedure (ECF No. 106-4 at 28–29). More generally, Dr. Dewey indicated that within six to eight weeks a hip-replacement patient would be able to bear weight on the leg, by twelve weeks would be 70 to 80 percent healed, and by six months would be definitely healed (ECF No. 106-4 at 11). Ultimately, he provided that he could not say within a reasonable degree of medical probability that her ongoing complaints of pain were caused by the malfunctioning of the Woodpecker device (ECF No. 106-4 at 36)

In support of her claims, Plaintiff submits several, short, "To Whom it May Concern" letters written by doctors. First, she submits two such letters from Dr.

Dewey, one dated August 18, 2014, approximately a year and a half after her hip replacement surgery, in which he states that Plaintiff was "status post January 2013 right total hip arthroplasty" and that she "has had some issues with ongoing pain, bursitis pain of her right hip . . . ." (ECF No. 121-2 at 7). Dr. Dewey also stated that Plaintiff had recently undergone a "reverse total shoulder arthroplasty on her right shoulder" that "had an excellent result but [she] still has weakness and issues with range of motion and strength" (ECF No. 121-2 at 7). The second letter from Dr. Dewey, dated September 28, 2017, also references Plaintiff's ongoing pain issues from both her hip and shoulder areas, as well as a low back condition, that affect her activities of daily living (ECF No. 121-2 at 6).

Plaintiff also submits two separate letters from Christopher Rush, M.D., dated March 28, 2014, and April 7, 2017, both of which reference "DJD" (degenerative joint disease) in her hip following "failed surgery" as well as her "longstanding lumbar radiculopathy," both of which cause pain and difficulty walking (ECF No. 121-2 at 2, 3). Next, Plaintiff submits a letter dated September 25, 2017, from Jason Marshall, M.D., who opined that Plaintiff's need for shoulder surgery, as well as her more recent need for surgery for the "triggering" of some of her fingers, was hastened because of her need for a walker, which Dr. Marshall traced to Plaintiff's hip problems (ECF No.

121-2 at 5). Last, Plaintiff submits an October 19, 2017, letter from Pablo W. Concepcion, M.D., who provided that he treated her with a selective nerve block which brought relief for her head pain but "did not make any difference in the actual pain, stemming from the hip" and that he treats her with "radiofrequency ablation" regularly which provides relief for her lumbar pain but not for her hip pain (ECF No. 121-2 at 8).

Plaintiff also submits physical therapy records from July of 2017 to show she still feels extreme pain; she has difficulties with walking more than 500 feet, with navigating stairs, and with squatting; and she has severe gait deviations (ECF No. 121-2 at 2, 18–20).

II.  SUMMARY JUDGMENT STANDARD

In order to prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his or her case or present affirmative evidence that the nonmoving party will be unable to prove his or her case at trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The

"mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

However, the nonmoving party may not simply rest upon the allegations of the pleadings but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional

evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. See Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994). The nonmoving party bears the burden of coming forward with evidence for each essential element of their claims, such that a reasonable jury could find in their favor. See Celotex Corp., 477 U.S. at 317; Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999). A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

With regard to the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
>
> **(4) Affidavits or Declarations.**  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, and will grant summary judgment if the moving party's motion and supporting

Page 13 of 18

materials—including the facts considered undisputed—show that the moving party is entitled to it. *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

III.   DISCUSSION

Under Florida law, the doctrine of strict liability for defective products provides that "a manufacturer, who places a potentially dangerous product on the market and encourages its use, undertakes a special responsibility towards members of the public who may be injured by the product." Samuel Friedland Family Enterprises v. Amoroso, 630 So. 2d 1067, 1068 (Fla. 1994). To succeed on a strict liability claim, the plaintiff must prove that "(1) a product (2) produced by a manufacturer (3) was defective or created an unreasonably dangerous condition (4) that proximately caused (5) injury." McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (citing Edward M. Chadbourne, Inc. v. Vaughn, 491 So.2d 551, 553 (Fla. 1986)).

Concerning the fourth prong of the standard, the prong upon which Defendants seek summary judgment, two types of causation must generally be proven: general causation, which is to show that the product in question can cause the type of harm allegedly experienced by Plaintiff, and specific causation, which is to show that the product did in fact cause the injury to Plaintiff. Kilpatrick v. Breg, Inc., 613 F.3d

1329, 1334 n.4 (11th Cir. 2010). The mere possibility that the product caused the alleged injury is insufficient. Hessen v. Jaguar Cars, Inc., 915 F.2d 641, 647 (11th Cir. 1990) (citing Gooding v. Univ. Hosp. Bldg., Inc., 445 So.2d 1015, 1018 (Fla. 1984)). Instead, to prove causation it must be shown that the defective product "directly and in natural and continuous sequence produces or contributes substantially to producing such . . . injury . . . so that it can reasonably be said that, but for the . . . defect, the . . . injury would not have occurred." Aubin v. Union Carbide Corp., 177 So. 3d 489, 513 (Fla. 2015) (quoting In re Std. Jury Instr. in Civ. Cases-Report No. 13-01, 160 So. 3d 869, 877 (Fla. 2015)); *see also* Guinn v. AstraZeneca Pharm. LP, 602 F.3d 1245, 1256 (11th Cir. 2010) (quoting Gooding, 445 So. 2d at 1018)).

Additionally, where, as here, the case is complex due to medical or scientific issues outside the scope of a layperson's knowledge, an expert's testimony is required to link the usage of the device to Plaintiff's ongoing medical difficulties Small v. Amgen, Inc., 723 F. App'x 722, 726 (11th Cir. 2018) (citing Guinn, 602 F.3d at 1256); *see also* Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1316 (11th Cir. 2014); Kilpatrick, 613 F.3d at 1334 n.4; McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1237 (11th Cir. 2005); Crest Prods. v. Louise, 593 So. 2d 1075, 1077

Page 15 of 18

(Fla. 1st DCA 1992) ("[L]ay testimony is legally insufficient to support a finding of causation where the medical condition involved is not readily observable.") (quoting Vero Beach Care Center v. Ricks, 476 So. 2d 262, 264 (Fla. 1st DCA 1985)); Peters v. Armellini Exp. Lines, 527 So. 2d 266, 269 (Fla. 1st DCA 1988) (collecting cases and noting in particular that "soft-tissue injuries, such as lower back difficulties, are not readily observable, and hence are not susceptible to evaluation by lay persons" (quotation omitted)).

The court agrees with Defendants that Plaintiff has failed to establish the causation element under her strict liability claim. Plaintiff puts forth sparse evidence with regard to how the malfunctioning of the Woodpecker device might have caused her medical injuries. The only evidence that might resemble expert testimony are the "To Whom it May Concern" letters cited above. While these letters from her physicians might state the ultimate fact that Plaintiff has had ongoing difficulty with ambulation or hip pain and a subsequent injury with her shoulder and fingers, they do not speak directly to any nexus between the use of the Woodpecker and her injuries. To the extent that any nexus is even suggested by these letters, they are purely conclusory in nature.[4]

---

[4] Defendants contend that these letters are inadmissible because they are unsworn statements and hearsay. Plaintiff does not respond to these assertions. Under Rule 56(e) of the Federal Rules

Moreover, Defendants provide sworn medical testimony to show no linkage between the Woodpecker malfunction and Plaintiff's injuries. Dr. Smith testified that, once her fracture was healed, Plaintiff would have a normal recovery that was synonymous with a patient who had not experienced a fracture. Both Drs. Lurate and Dewey found no evidence that Plaintiff's hip implant was loose, and x-ray results of the hip were negative. Dr. Dewey found that Plaintiff had recovered well from the surgery, and Dr. Lurate saw Plaintiff's later complaints of pain as derived from her lumbar spine issues, not her hip. Neither could find that Plaintiff's ongoing complaints were the result of the Woodpecker malfunction. Likewise, even beyond the fact that it is an attenuated connection between Plaintiff's surgery, her subsequent use of a walker, and her subsequent need for surgery on her shoulder and fingers, Plaintiff had extensively used her walker before the surgery was performed. Additionally, Dr. Smith testified that a multitude of his patients undergoing the same

---

of Civil Procedure, an unsworn statement fails to meet the requirements for summary judgment review and therefore cannot be considered by the court. Carr v. Tatangelo, 338 F.3d 1259, 1273 (11th Cir. 2003) (citing Adickes, 398 U.S. at 158 n.17). The court notes the possibility that some or all of these letters were not authored as statements with particular regard to this case, but were directed to other legal, health, or administrative matters concerning Plaintiff. It is therefore *possible* that the letters might fall within exceptions to the hearsay rules, particularly Rule 803(4), which concerns statements made for the purpose of medical diagnoses or treatment, or Rule 803(6), which concerns records pertaining to regularly conducted business activity. In any case, the scant weight of this evidence does not determine the outcome of summary judgment, and therefore the court need not decide its admissibility.

procedure have used walkers without complication. Finally, it bears emphasis that fractures are a common-enough complication regardless of the procedure employed, but in Plaintiff's case a fracture might have been more likely to occur due to her avascular necrosis. Moreover, all indicators were that Plaintiff's own fracture was well-treated with no indication of further complication.

## IV. CONCLUSION

Based on the court's finding that Plaintiff has failed to submit sufficient evidence to establish that the Woodpecker device caused the injuries complained of, the court concludes that she has failed to show that she can prove this essential element of her claim. The court therefore finds there to be no genuine dispute as to any material fact and that Defendants are entitled to judgment as a matter of law.

For the aforementioned reasons, it is respectfully **RECOMMENDED**:

1. That Defendants' Motions for Summary Judgment Motions (ECF Nos. 105, 107, 113) be **GRANTED**.

2. That Plaintiff's Motions for Summary Judgment (ECF Nos. 103, 121, 122) be **DENIED.**

3. That all remaining motions be **DENIED** as moot.

4. That the Clerk be directed to enter judgment in favor of Defendants and close this case.

At Pensacola, Florida, this 4th day of June 2019.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**